[Crim. No. 6983.   In Bank.   Jan. 25, 1962.]

THE PEOPLE, Plaintiff and Respondent, v. LORENZO WILLIAMS, Defendant and Appellant.

Ellery E. Cuff, Public Defender, Edward B. Olsen and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and George W. Kell, Deputy Attorney General, for Plaintiff and Respondent.

DOOLING, J.—Defendant was charged, in two counts, with the crimes of burglary and robbery. The charges rested on these allegations: defendant's unlawful entry of the apartment of Charlotte Young with intent to commit theft and there robbing one Earl Howe while armed with a revolver. Upon arraignment he entered a plea of not guilty to both counts. In a jury trial and following the prosecution's failure to produce Miss Young as a witness, the burglary charge upon motion of the prosecution was dismissed. The trial proceeded on the second count and defendant was found guilty as charged—robbery in the first degree. Thereafter defendant moved for a new trial on the ground of newly discovered evidence. That motion was denied as was defendant's application for probation, and defendant was sentenced to the state prison. He appeals from the judgment and from the order denying his motion for a new trial.

The sole issue on this appeal is the propriety of the trial court's denial of defendant's motion for a new trial based on the ground of newly discovered evidence. (Pen. Code, § 1181, subd. 8.) Defendant contends that such denial amounted to an abuse of discretion. We have concluded that under the facts of this case this contention is correct.

Defendant had lived with Charlotte Young for almost 11

years and they had two daughters, aged 3 and 9 years. They then separated. Thereafter Miss Young transferred her attentions to Earl Howe, who was the chief witness for the prosecution. Howe testified as follows: On November 14, 1959, he and Miss Young left her apartment about 9 p. m. They first took Miss Young's 3-year-old daughter to the home of Miss Young's sister, where they left the child, and then proceeded to a party. About 3 a. m. the next morning they returned to the sister's home, picked up the child, and then went to Miss Young's apartment, arriving there shortly after 4 a. m. As Howe opened the door and turned on the light, defendant "popped out" of a closet from the hallway holding in his hand what appeared to be a loaded revolver. After remarking "I caught you with your man," defendant told Howe to disrobe and Howe complied, removing his coat, pants and shirt. Defendant pushed Howe into a corner, picked up the clothes and started out the door stating to Miss Young that he was going to use the clothes as evidence against her, that he was going to "mess [her] up." Miss Young then grabbed defendant, who pushed her aside and poured beer on her. In the pocket of Howe's pants was a wallet and $36, and the total value of the belongings taken from Howe amounted to more than $100. As soon as defendant left, Miss Young called the police and they arrived in about 20 minutes. Howe made a written report at the police station at about 8 :30 a. m. that day. On cross-examination Howe was asked whether after defendant had left the apartment, Miss Young had made another call before telephoning the police, and Howe said that she had not.

Defendant was arrested about midnight of November 15. Two police officers testified that they had talked with defendant the next day and that he told them that he had not been at Miss Young's apartment during any of the time in question, that he knew nothing about any clothes or money being taken from there, and that he had never owned or possessed a gun.

Defendant testified as follows: On November 14, 1959, about 11 p. m. he telephoned Miss Young inviting her to a dance that evening but she refused. He then went out with friends and the next morning about 2 :15 a. m. he again telephoned Miss Young, asked if he "could come over and see her" at her home and she said he could. He then went to another party, stayed until about 3 :30 a. m., continued on to a restaurant with friends, and finally reached Miss Young's

apartment shortly after 4 a. m. When he arrived there he found dim lights and "music was playing." He pushed down the latch, entered the apartment and walked to the back bedroom. There he saw Howe, Miss Young and his own 3-year-old daughter by Miss Young sleeping in the same bed. Howe's clothes were on a chair. Defendant picked up Howe's clothes —coat, pants and shirt—and put them on the top shelf of the linen closet. Defendant then awakened Miss Young and she followed him into the living room to talk. He told her that she and another man should not sleep in the same bed with the child. They argued, she ran and got a knife, and defendant threw beer in her face. Defendant thereupon awakened Howe and told him that he did not want to catch him in that bed again. Then defendant left. He denied taking any clothes or property that belonged to Howe, and stated that he had never owned a gun and did not have one when he was in Miss Young's apartment that morning. The police never found the alleged gun or the clothes.

On cross-examination, defendant admitted that after his arrest he had denied to the police that he had been to Miss Young's apartment on the morning in question. He said that he made such denial because he was on probation and that he had been ordered not to go there.

Napoleon Ball testified for defendant stating that he had been with defendant on the evening of November 14, 1959, and went with defendant to all the places defendant had named until defendant left the restaurant the next morning about 4 a. m.—which was the time defendant testified that he went to Miss Young's apartment.

Miss Virginia Barton also testified for defendant. She stated that she had received a telephone call from Miss Young in the early morning of November 15. When she was asked to give the substance of that conversation, the prosecution successfully objected that such recital was inadmissible since Miss Young had not testified at the trial and therefore she could not be so impeached.

Upon this conflicting evidence, defendant was found guilty on the robbery count. He moved for a new trial on the ground of newly discovered evidence. (Pen. Code, § 1181, subd. 8.) That section provides: "When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only: . . . 8. When new evidence is discovered material to the defendant, and which he could not, with reasonable diligence,

have discovered and produced at the trial. When a motion for a new trial is made upon the ground of newly discovered evidence, the defendant must produce at the hearing, in support thereof, the affidavits of the witnesses by whom such evidence is expected to be given. . . ."

In support of his motion for a new trial defendant filed four affidavits: (1) The affidavit of Deputy Public Defender Olsen, defendant's attorney, stated in substance that on March 23, 1960, five days after the verdict was rendered, he received a telephone call from Mrs. Nora Miller, who identified herself as the mother of Charlotte Young; that Mrs. Miller told him that the testimony upon which defendant had been found guilty was untrue, and she stated facts which confirmed testimony given by defendant at the trial; that he thereafter obtained affidavits from defendant, Mrs. Miller and Esmond Lewis, Miss Young's brother-in-law; that until this telephone call of March 23, he had no knowledge that anyone else was present at the time in question in Miss Young's apartment other than the two alleged victims and defendant.

(2) The affidavit of defendant stated in substance that his testimony at the trial was entirely true except for the single fact that he testified that he called Miss Young about 2 a. m. on November 15, and she invited him "to come on over," whereas in reality, there was no answer on the phone; that he did not tell his attorney about Mrs. Miller's presence in Miss Young's apartment when he walked in there because Mrs. Miller and he "had had some words a short time before" and he therefore assumed that she would deny being there and would not do anything "to help" him; that it was not until after the trial that Mrs. Miller called him, said that she had learned about the verdict and believed "the case had been allowed to go too far," and expressed her willingness to help "bring out the true facts"; that he then gave Mrs. Miller his attorney's phone number and asked her to call him, which she did; that until he received the phone call from Mrs. Miller, he had no way of proving Howe's story was "a complete fabrication" except through the testimony of Virginia Barton but Miss Barton was not allowed at the trial to testify as to a telephone conversation she had had with Miss Young which "would have proved Earl Howe was lying"; and that until his telephone conversation with Mrs. Miller, he had no knowledge that either Esmond or Willa (Esmond's wife) Lewis knew anything about the case.

(3) The affidavit of Mrs. Nora Miller stated in substance

that she lived in a flat in the same building as her daughter, Miss Young; that she heard her daughter come home around 3:30 a. m. on November 15, 1959; that a little later her phone "rang once" as a prearranged "signal" from her daughter and she "went over to her [daughter's] flat"; that Howe had been "drinking heavily" and was "lying down asleep"; that about 15 minutes later defendant walked in through the door she had left "slightly ajar"; that defendant looked into the back bedroom, saw Howe's clothes on a chair, and threw them into a hall closet; that he then went into the living room and talked to Miss Young for almost an hour, mainly about the possibility of a reconciliation; that Howe then awoke and "yelled to Charlotte," who went into the other room, and defendant left; that defendant had no gun with him, had not threatened either Howe or Miss Young in any way, and he did not take any clothes or anything else belonging to them; that later that same morning, about 9 a. m., Mrs. Miller, her other daughter Willa, and Willa's husband, Esmond Lewis, were in Miss Young's flat and they all heard Howe say that he had figured out a scheme to "fix" defendant and keep him away from there; that he, Howe, was going to tell the police that defendant "had broken into the place," "pulled a gun on" them, "forced him to take off all his clothes down to his shorts," and then left taking Howe's "clothes containing money"; that Howe thereupon pulled the screen off the back door so as to "make it look like [defendant] broke in"; that Howe did call the police and they came about 11 a. m.; that she heard Howe "tell that story" but she did not want to interfere in her daughter's affairs and "had no idea the story would cause all of this trouble"; that they all knew that Howe "made up this story" because "he was jealous of [defendant] and he wanted [Miss Young] for himself and he was afraid she might go back to [defendant]."

(4) The affidavit of Esmond Lewis stated in substance that on November 15, 1959, about 9:30 a. m. he and his wife Willa went to Miss Young's place; that Howe and Mrs. Miller were there; that Howe appeared angry about an incident earlier that morning when he said that defendant had walked into the flat, found Howe asleep in bed, and had picked up Howe's clothes and "taken them out"; that Howe said that he did not want defendant around there any more and he was going to fix it so defendant would "get some time"; that Howe and Miss Young concocted the story to get defendant "into trouble," representing that defendant had a gun; that Lewis did not

take Howe seriously and did not think Howe "would go through with such a wild scheme," telling Howe that he "would get tripped up" with the police and "get caught for perjury"; that he did not know "until very recently" that defendant had been accused in court on that story; that he had never known defendant to use, carry or own a gun; that if Howe testified that defendant had a gun and forced him to take off his clothes in Miss Young's flat at the time in question, that "testimony is a lie"; that if Howe testified that he and Miss Young had left the child at Lewis' home for several hours the night of November 14 and then picked her up around 3 a. m. the next morning, such testimony also "is a lie" because Lewis and his wife were not even home that night; and that he made the affidavit in the hope of helping to "correct what has been a horrible miscarriage of justice."

■ Defendant concedes that the granting or denial of a motion for a new trial on the ground of newly discovered evidence is a matter within the sound discretion of the trial court. (*People* v. *Greenwood*, 47 Cal.2d 819, 821 [306 P.2d 427]; *People* v. *Egbert*, 43 Cal.App.2d 117, 118 [110 P.2d 495].) ■ It is also well settled that such motions are looked upon with disfavor (*People* v. *Yeager*, 194 Cal. 452, 491 [229 P. 40]; *People* v. *Fong Shee Shung*, 42 Cal.App.2d 721, 724 [109 P.2d 974]) and that unless there is a clear showing of an abuse of discretion, an appellate court will not interfere. (*People* v. *McGarry*, 42 Cal.2d 429, 432-433 [267 P.2d 254]; *People* v. *Gompertz*, 103 Cal.App.2d 153, 163 [229 P.2d 105]; *People* v. *Gilbert*, 62 Cal.App.2d 933, 937 [145 P.2d 924].)

■ To entitle a party to have a new trial on this ground, "it must appear, —'1. That the evidence, and not merely its materiality be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'" (*People* v. *Beard*, 46 Cal.2d 278, 281 [294 P.2d 29]; *People* v. *McGarry, supra*, at p. 433; *People* v. *Sutton*, 73 Cal. 243, 247 [15 P. 86].)

■ In determining whether there has been a proper exercise of discretion on such motion, the case must be judged from its own factual background. Defendant argues that his conviction rested wholly on fabricated testimony, that the affidavits submitted in support of his motion for a new trial set forth the newly discovered evidence which probably would

lead to a different result on a retrial, that he could not with reasonable diligence have produced such evidence at the trial, and that the trial court therefore abused its discretion in denying his motion. ■ Under the very unusual facts of this case we are satisfied that the motion for new trial should have been granted.

At the trial the sole evidence of defendant's guilt was the testimony of Howe. There was no corroboration of Howe's story in any respect. Miss Young, in whose apartment the offense purportedly occurred, although she had testified at the preliminary hearing was not produced to testify at the trial. (Her absence was explained by the testimony of her sister, Mrs. Lewis, that she had gone to Sacramento.) It does not appear that the gun allegedly carried by defendant or the clothes and money claimed to have been taken by defendant were ever found in his possession. The affidavits of Mrs. Miller and Mr. Lewis, Miss Young's mother and brother-in-law respectively, provide defendant with a complete defense in that they refute Howe's story in its entirety, and they were made by unbiased witnesses, persons with nothing to gain; in fact in making the affidavits, they were incriminating a member of their own family in at least acquiescing in a false story causing another to be arrested and charged with a crime. (See Pen. Code, § 182, subd. 2.)

It is argued that since defendant in his affidavit admitted having given false testimony in one instance at the trial—he had testified that when he called Miss Young at her apartment about 2 a. m. the morning of November 15, she had invited him to "come over," whereas in fact there was no answer to his call—the trial court was justified in distrusting defendant as to other statements defendant made in his testimony or in his affidavit. (Code Civ. Proc., § 2061, subd. 3; see *People* v. *Kennedy,* 21 Cal.App.2d 185, 201 [69 P.2d 224].) Thus the trial court would be warranted in rejecting as false defendant's statement in his affidavit that he "did not think to tell [his] attorney that Mrs. Miller was in Charlotte's apartment when [he] walked in there because [he] assumed she would deny being there or would somehow try to keep from getting involved"—they "had had some words a short time before" and he did not think she would do anything to help him, and he did not ask her. And upon the same premise, the trial court would not be required to accept as true defendant's statement in his affidavit that until he received the telephone call from Mrs. Miller (after the trial) he had no knowledge

that Esmond and Willa Lewis knew anything about the case. But defendant's admission of one instance of false trial testimony does not appear to have been material to the robbery charge on which he was convicted and his correction of that testimony in his affidavit was a purely voluntary act on his part. Under the circumstances it would scarcely form a reasonable basis for the trial court's disbelieving all further statements of defendant in a separate proceeding, a motion for a new trial, based on newly discovered evidence involving a fabricated story, which statements of defendant were fully corroborated by the recitals of unbiased witnesses, Mrs. Miller and Esmond Lewis, in their respective affidavits. Neither of these alleged witnesses appears to have had any motive to falsify the actual happening of events, and it is to be presumed that each was telling the truth. (Code Civ. Proc., § 1847.)

The cases of *People* v. *Kirk*, 98 Cal.App.2d 687, 692 [220 P.2d 976], and *People* v. *Gompertz*, 103 Cal.App.2d 153, 163 [229 P.2d 105], cited by the prosecution, do not militate against defendant's claim as to the verity of the affidavits supporting his motion for a new trial. Each of these cases is factually distinguishable: In *Kirk* defendant's affidavit was contradicted on "all the material charges" by his attorney; here no counteraffidavits were filed in opposition to defendant's motion and supporting affidavits. In *Gompertz* the proffered new evidence in the affidavit came from a person who in the event of a new trial "might choose to stand on his constitutional rights and refuse to testify" on the ground that such testimony might tend to incriminate him (U. S. Const., 5th Amend.) so that there was considerable doubt as to whether a new trial would produce a different result.

It is true that Mrs. Miller's proffered testimony in the strict sense may not be classified as newly discovered evidence. Admittedly defendant knew that Mrs. Miller was present at the time of the alleged incident but, according to his affidavit, defendant did not so inform his attorney because he did not think "she would do anything to help" him. The fact that a witness if called might refuse to testify is no excuse. (*People* v. *Sullivan*, 3 Cal.App. 502, 513 [86 P. 834].) While defendant allegedly did not know what her testimony would be until she telephoned him after the trial, it is argued that it was incumbent on him, in the exercise of reasonable diligence, to have ascertained what her testimony would be. Defendant was "on bail" for several months before the trial. He presumably knew, from the testimony at the preliminary examination, the

nature of the "fabricated" story involving his use of a gun and the taking of Howe's property as basis for the robbery charge. Still defendant did not communicate with Mrs. Miller, a witness who purportedly could discredit Howe's story, nor advise his attorney of her presence at the time of the alleged incident.

"Facts that are within the knowledge of the defendant at the time of trial are not newly discovered even though he did not make them known to his counsel until later. . . ." (*People* v. *Greenwood, supra,* 47 Cal.2d 819, 822.) However, in *Greenwood,* on the hearing of the motion for a new trial, it appeared that the "newly discovered evidence" came from someone who had been a defense witness at the trial, "neither defendant nor his attorney presented any affidavit to show that they did not previously know the facts" which they claimed to be "the true facts," and defendant's attorney admitted having previously heard "rumbles" about the alleged true "situation." (47 Cal.2d at p. 822.)

Concededly one who relies upon the ground of newly discovered evidence to sustain his motion for a new trial "must have made reasonable effort to produce all his evidence at the trial, and . . . he will not be allowed a new trial for the purpose of introducing evidence known to him and obtainable at the time of trial, or which would have been known to him had he simply exercised reasonable effort to present his defense." (*People* v. *Shepherd,* 14 Cal.App.2d 513, 518 [58 P.2d 970]; also *Dasso* v. *Bradbury,* 39 Cal.App.2d 712, 717 [104 P.2d 128].) But it must also be recognized that "despite the exercise of such effort, cases will sometimes occur where, after trial, new evidence most material to the issues, and which would probably have produced a different result, is discovered. It is for such cases that the remedy of a motion for a new trial on the ground of newly discovered evidence has been given." (*People* v. *Fong Shee Shung, supra,* 42 Cal.App.2d 721, 724.)

The term "diligence" is "incapable of exact definition because it is a relative term" (*Shivers* v. *Palmer,* 59 Cal.App.2d 572, 580 [139 P.2d 952]) and the "diligence" of defendant in marshaling his evidence for the trial must be determined in the light of the "peculiar circumstances" involved. (*People* v. *Goodwin,* 202 Cal. 527, 539 [261 P. 1009].) Here while defendant knew of Mrs. Miller's presence in Miss Young's apartment at the time of the alleged incident and her purported ability, if she chose, to discredit Howe's

story, defendant maintains that her assumed unfriendly attitude toward him deterred him from attempting any interview with her or even mentioning her presence to his attorney. He further argues that she presumably knew about the "fabricated" story that was presented at the preliminary examination and yet she did not "come forward" to offer her testimony for the trial; that from her affidavit, she apparently was unwilling to "interfere" in the affairs of Miss Young (her daughter) and had no "idea the [Howe] story would cause all of this trouble" until after the trial resulting in defendant's conviction based solely on Howe's testimony; and then only did she resolve to offer her testimony because she could not "just stand by and let an innocent man go to prison for another man's lies." Defendant submits that these considerations constitute a reasonable explanation for both his failure to tell his attorney about Mrs. Miller or to produce her at the trial. Moreover, defendant submits that any purported lack of diligence in this regard on his part might be excused on the ground that he had placed great reliance on the testimony of Miss Barton to show the falsity of Howe's story but her testimony was held inadmissible only as a result of the failure of the prosecution to produce Miss Young as a trial witness.

But conceding that the proffered evidence from Mrs. Miller was not "newly discovered" since defendant knew of her presence at the time of the alleged incident though until after the trial he was unaware of the fact that she would be willing to testify in his favor, this may not be said about the "newly discovered evidence" from Esmond Lewis. It may not be reasonably inferred that defendant by simply interviewing Mrs. Miller, who, from the allegation of her affidavit, did not want to testify, could have discovered that Lewis knew that there was a plot against defendant—that Lewis and his wife were present with Mrs. Miller in Miss Young's apartment later on the morning of November 15 when Howe allegedly said that he had figured out a scheme to "fix" defendant. Mrs. Miller was a potentially hostile witness and what she might have told defendant prior to the trial was, in defendant's words, "anyone's guess."

As stated in *People* v. *Greenwood, supra,* 47 Cal. 2d 819, at page 821, the claim of newly discovered evidence as a ground for a new trial is uniformly "looked upon with disfavor," for there must be an end to litigation. However, where the "newly discovered evidence" contradicts the

"strongest evidence introduced against" defendant (*People v. Gilbert*, 62 Cal.App.2d 933, 938 [145 P.2d 924]) and comes from an unexpected source (*cf. People* v. *Henry*, 142 Cal. App.2d 114, 122 [298 P.2d 80]), it would appear proper that defendant should have the opportunity of trying to present such evidence for the consideration of the trier of the facts. ▮ Here there is every reason to believe that defendant did not have a "fair trial on the merits, and that by reason of the newly discovered evidence the result could reasonably and probably be different on a retrial." (*People* v. *Shepherd, supra*, 14 Cal.App.2d 513, 519; see 36 Cal.Jur. 2d, "New Trial," § 77, p. 239.) There is the further factor in this case that the affidavits of Mrs. Miller and Lewis disclose a deliberate scheme to produce false evidence and to abuse and subvert the process of the court for the purpose of bringing about the conviction of an innocent man. Courts of justice must be particularly sensitive to prevent such a criminal perversion of their proper functions. It therefore must be concluded that under the very unusual facts of this case it was an abuse of discretion for the trial court not to have granted defendant's motion for a new trial. It was said in *People* v. *Reed*, 27 Cal.App.2d 484 [81 P.2d 162], at page 493: "For a guilty man to escape punishment is a miscarriage of justice, but for an innocent man to be convicted is unthinkable."

The judgment and order denying defendant's motion for new trial are reversed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., and White, J., concurred.

McComb, J., concurred in the judgment.